UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| MASS DYNAMICS, LLC, BOSTON VAPOR, LLC, LINDA AND JEFFREY VICK d/b/a VICK'S VAPE SHOP, JIMBUDDY'S INCORPORATED, and, JERALD MOLLMAN d/b/a J'S VAPOR DEN,<br>    Plaintiffs,<br><br>v.<br><br>CHARLES D. BAKER, in his official capacity as GOVERNOR OF THE COMMONWEALTH OF MASSACHUSETTS, MONICA BHAREL, M.D., in her official capacity as DEPARTMENT OF PUBLIC HEALTH COMMISSIONER, and COMMONWEALTH OF MASSACHUSETTS,<br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION NO. 19-12035<br><br>**ORAL ARGUMENT REQUESTED** |

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

**I.    <u>INTRODUCTION</u>**

Plaintiffs Mass Dynamics, LLC ("Mass Dynamics"), Boston Vapor, LLC

("Boston Vapor"), Linda and Jeffrey Vick doing business as Vick's Vape Shop

("Vick's"), JimBuddy's Incorporated ("JimBuddy's"), Jerald Mollman doing business as

J's Vapor Den ("Vapor Den") (collectively, the "Plaintiffs"), a group of small, family

owned businesses, bring this motion to restrain and enjoin Governor Charles D. Baker, in

his official capacity as Governor of the Commonwealth of Massachusetts ("Governor

Baker"), and Monica Bharel, M.D., in her official capacity as the Commissioner of the

Department of Public Health ("Commissioner Bharel") (together, the "Defendants"),

from enforcing an unconstitutional "Emergency Order" banning the sale or display of electronic cigarettes, vapes, vaporizer, vape pens, hookah pens, e-pipes and related products and components thereof – known as electronic nicotine delivery systems ("ENDS") – in addition to so-called "e-liquids," which have been deemed safe and effective for marketing and use in the United States by the Food and Drug Administration ("FDA").

Notwithstanding that the FDA already determined that the products sold by the Plaintiffs are approved for marketing and sale in the United States, Governor Baker recently issued an "emergency declaration" (the "Declaration") empowering Commissioner Bharel to issue an order (the "Commissioner's Order") prohibiting the sale of ENDS products and e-liquids (the "Ban"), including but not limited to related signage (the "Signage Regulation").  See Governor's Declaration, attached hereto as Exhibit 1; see also Commissioner's Order, attached hereto as Exhibit 2; see also Signage, attached hereto as Exhibit 3.  The Ban on the entire class of products will only be lifted "[u]pon declaration by the governor that such emergency has terminated."  See G.L. c. 17, § 2A.

As discussed more fully below, the Ban violates the Commerce Clause, the Contracts Clause, and the First Amendment of United States Constitution, in addition to violating the Supremacy Clause and the Fifth and Fourteen Amendments of the U.S. Constitution.  Therefore, this Court should issue a temporary restraining order ("TRO"), and a preliminary injunction, enjoining the Defendants from enforcing the Ban, because the Plaintiffs have a reasonable likelihood on the success of the merits of their claims, and they will suffer irreparable harm if the Defendants continue to enforce the Ban.

## II. FACTUAL BACKGROUND

### 1. The Need For Immediate Judicial Intervention

The Plaintiffs are a group of small, family owned businesses operating within the Commonwealth of Massachusetts. They are engaged in the marketing and sale of ENDS products and e-liquids. Since the Ban went into effect, the Plaintiffs have been losing $4,000 - $5,000 per week, per store, in revenue from the loss of sales of ENDS products and e-liquids. To the extent that the Ban remains in effect until January 25, 2020, the Plaintiffs will be forced to lay off employees, and will likely be forced to break their leases and close their businesses. See Verified Amended Complaint at ¶ 94.

### 2. ENDS Products

ENDS products are a technology which has been marketed and sold in the United States since approximately 2008. ENDS products are not traditional cigarettes, as they do not use tobacco and there is no combustion or smoke emitted as a result of their use and consumption. See Verified Amended Complaint at ¶¶. Rather, ENDS products produce an aerosol which is created when a lithium battery activates a heating coil (called an atomizer) which in turn results in the vaporization of an e-liquid solution. ENDS products have the same purpose and functional utility – they allow the user to inhale the vapor through a mouthpiece (called "vaping"), with the aerosol providing a flavor and physical sensation similar to that of smoking a cigarette. Id. at ¶¶

A large and growing body of scientific evidence indicates that ENDS products, while not completely harmless, do not pose the same harms and health risks, and are substantially less harmful, than traditional combustible tobacco products. Moreover, there is considerable evidence that the overwhelming majority of users of ENDS products

in the United States, commonly identified as "vapers," are now former cigarette smokers who have turned to the several generations of ENDS products as a smoke-free alternative to reduce or outright quit smoking, and to avoid the significant health hazards associated with combustible tobacco products.[1]  See Verified Amended Complaint at ¶ 48.

In 2018, the National Academies of Science, Engineering and Medicine completed an exhaustive review of the peer-reviewed literature on ENDS products. Such study concluded, in pertinent part, from such literature that:

> "[l]aboratory tests of e-cigarette ingredients, in vitro toxicological tests, and short-term human studies suggest that e-cigarettes are likely to be far less harmful than combustible tobacco cigarettes."[2]

### 3.    FDA Regulation Of ENDS Products

The FDA first began regulating ENDS products in the same manner as traditional tobacco products (*e.g.*, cigarettes) in May 2016 upon the publication of what is colloquially known as the "Deeming Rule" to be effective on August 8, 2016.  Id. at ¶ 54

The Family Smoking Prevention and Tobacco Control Act (the "TCA") initially charged the FDA with regulating "all cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco." In addition, the TCA delegated authority[3] to the FDA to regulate "any other tobacco products that [the FDA] by regulation deems to be subject to this

---

[1] Paul Blair, *New CDC Data, More Than 9 Million Adults Vape Regularly in the United States,* Americans for Tax Reform (November 9, 2015), <https://www.atr.org/new-cdc-data-more-9-million-adults-vape-regularly-united-states> (accessed September 27, 2019).

[2] See National Academies of Science, Engineering and Medicine: Committee on the Review of the Health Effects of Electronic Nicotine Delivery Systems, THE PUBLIC HEALTH CONSEQUENCES OF E-CIGARETTES (Kathleen Stratton *et al.* eds., 2018), available at <https://tinyurl.com/ya4w37kb> (accessed September 27, 2019).

[3] The constitutionality of Congress' delegation of deeming authority to the FDA is presently at issue in Big Time Vapes, Inc. vs. Food and Drug Admin, No 1:19-cv-00531-HSO-JCG (D. Miss. 2019).

chapter."[4]  See Verified Amended Complaint at ¶ 55.  Effective August 8, 2016, the FDA

invoked this deeming authority to extend the TCA's requirements to ENDS products that

contain or are intended to be used with tobacco-derived ingredients such as nicotine.[5]  Id.

at 56.

Because of the Deeming Rule, all ENDS products are now subject to, among

other regulations:

a. Prohibitions on the sale of adulterated or contaminated tobacco products;[6]

b. Prohibitions on the sale of misbranded tobacco products;[7]

c. Requirements that manufacturers submit health information (*e.g.*, health studies, ingredient reports) regarding each tobacco product;[8]

d. Requirements that manufacturers register their production facilities with the FDA;[9]

e. Restrictions on advertising the sale and distribution of tobacco products;[10]

f. Promulgated good manufacturing practices;[11]

g. Tobacco product standards *(e.g.*, flavor restrictions) adopted through notice-and-comment rulemaking;[12]

---

[4] 21 USC § 387a(b).

[5] 81 Fed Reg at 28,975.

[6] 21 USC § 387b.

[7] 21 USC § 387c.

[8] 21 USC § 387d.

[9] 21 USC § 387e.

[10] 21 USC § 387f(d).

[11] 21 USC § 387f(e).

[12] 21 USC § 387g(a).

h.      Requirements that manufacturers establish and maintain records;[13] and

i.      Prohibitions on manufacturers and retailers distributing free samples of tobacco products, except free samples of smokeless tobacco (*i.e.*, chewing tobacco), which may be distributed in "qualified adult-only facilities."[14]

As a result of the Deeming Rule, ENDS product manufacturers must submit substantial information to the FDA, including scientific research findings on the ability of the products to reduce risk or exposure, data and information on how consumers actually use the products, and post-market surveillance studies. The ENDS product manufacturers must also demonstrate that there is a significant reduction in risk of tobacco-related disease and the FDA must take into account, on a population level, the health benefit to users of tobacco products and those who do not use such products (the "public health benefit" standard).[15] See Verified Amended Complaint at ¶ 58.

The TCA also requires ENDS product manufacturers of any "new tobacco product" to obtain pre-market authorization prior to commercial sale. The TCA defines a "new tobacco product" to mean, in part, "any tobacco product ... that was not commercially marketed in the United States as of February 15, 2007," known as the Grandfather Date. 21 U.S.C. § 387j. Any tobacco product that was on the market as of the Grandfather Date is exempt from the FDA pre-market review requirements.[16] See Verified Amended Complaint at ¶ 59.

---

[13] 21 USC § 387(i).

[14] 21 USC § 387a-1(a).
[15] 21 USC § 387k.

[16] 21 USC §§ 387eG), 387j(a).

The FDA has explicitly permitted the marketing of ENDS products, as a "special rule" in the TCA prohibiting characterizing flavors other than tobacco and menthol as only applying to cigarettes.[17] In March 2018, the FDA published an Advanced Notice of Proposed Rulemaking, 83 Fed Reg 12994 (Mar. 21, 2018), which solicited the submission of studies, information and public comments regarding the role of flavors in tobacco products, including ENDS products. More recently, the FDA announced that it would soon be finalizing a Guidance Document potentially revising the current compliance policy for non-tobacco flavored ENDS products established by the Maryland District Court.[18] Id. at 62.

Beyond the FDA, ENDS products are also subject to a number of federal requirements including, among other things, child-resistant packaging under the Child Nicotine Poison Prevention Act, as administered by the Consumer Product Safety Commission, numerous environmental and hazardous waste disposal laws, as well as false and misleading advertising and marketing restrictions under Section 5 of the Federal Trade Commission Act.[19] See Verified Amended Complaint at ¶ 63.

---

[17] 21 USC § 387g(a)(l)(A).

[18] Food and Drug Administration, Trump Administration Combating Epidemic of Youth E-Cigarette Use with Plan to Clear Market of Unauthorized, Non-Tobacco-Flavored E-Cigarette Products, Press Release (September 11, 2019), available at <https://www.fda.gov/news-events/press-announcements/trump-administration-combating-epidemic-youth-e-cigarette-use-plan-clear-market-unauthorized-non> (accessed September 74, 2019).

[19] Food and Drug Administration, Trump Administration Combating Epidemic of Youth E-Cigarette Use with Plan to Clear Market of Unauthorized, Non-Tobacco-Flavored E-Cigarette Products, Press Release (September 11, 2019), available at <https://www.fda.gov/news-events/press-announcements/trump-administration-combating-epidemic-youth-e-cigarette-use-plan-clear-market-unauthorized-non> (accessed September 27, 2019).

4.    **Illegal Vaping Products Cause Majority Of Pulmonary Issues**

Beginning in the summer of 2019, numerous media reports began circulating that individuals across the United States who vaped were suffering from severe pulmonary issues, colloquially termed as "vaping related" illnesses.  Id. at ¶ 80  While federal and state health officials initially cast blame upon ENDS products, subsequent investigation and testing of the suspected products used by these individuals revealed that most likely the result of the severe pulmonary issues was the illicit addition of delta-9 tetrahydrocannabinol (THC) and/or marijuana.[20] Id. at ¶ 81

Neither THC and/or marijuana are included as ingredients of any ENDS product presently registered with the FDA or permitted for retail sale in the United State under federal law. Nevertheless, some consumers add their own aftermarket oils to ENDS products, including THC and/or marijuana.[21] See Verified Amended Complaint at ¶ 82. The illegal vapor cartridges that contain THC and/or marijuana have also been reported to contain significant amounts of vitamin E acetate, which is a diluting and thickening agent that makes cannabis oil more affordable.[22] Id. at ¶ 83

In most cases of reported pulmonary illnesses, health authorities have found

---

[20] Michelle Minton, Update: Big Picture in 'Vaping-Linked' Lung Poisonings, Competitive Enterprise Institute (September 16, 2019), available at <https://cei.org/blog/update-big-picture- vaping-linked-lung-poisonings> (accessed September 27, 2019).

[21] Lena Sun, *What we know about mysterious vaping linked illnesses,* The Washington Post (September 7, 2019), at <https://www.washingtonpost.com/health/2019/09/07/what-we-know-about-mysterious-vaping-linked-illnesses-deaths/> (accessed September 27, 2019).

[22] Paige Minfield Cunningham, The Health 202: Vaping illnesses sparked the e-cig crackdown. But marijuana is likely to blame, The Washington Post (September 18, 2019), at <https://www.washingtonpost.com/news/powerpost/paloma/the-health-202/20l 9/09/18/the- health-202-vaping-illnesses-sparked-the-e-cig-crackdown-but-marijuana-is-likely-to- blame/5d812a6a88e0fa7bb93a8b9c/> (accessed September 27, 2019).

vitamin E acetate residue in the patients' lungs. The current scientific thinking is that the vitamin E acetate and other oils contained in these altered products might not completely transform into vapor when heated, and instead travel into the user's lungs thus causing pulmonary disorders.[23] Id. at 84.

These aftermarket THC and/or marijuana oils and the cutting agents are illegal under federal law as well as the laws of many states, are purchased on the black market and are not available for sale at regulated vapor shops.[24] Id. at ¶ 85

**5.    The Declaration And The Ban**

On September 24, 2019, Governor Baker issued the Declaration, and Dr. Bharel issued the Commissioner's Order. Governor Baker ordered that the Declaration and the Ban were effective immediately. See Ex. 1; see also Ex. 2.

The terms of the Declaration and the Commissioner's Order are, in part, as follows:

> The sale or display of all vaping products to consumers in retail establishments, online, and through any other means, including all non-flavored and flavored vaping products, including mint and menthol, including tetrahydrocannabinol (THC) and any other cannabinoid, is prohibited in the Commonwealth.

See Ex.1; see also Ex. 2.

**6.    The Signage Regulation**

On or around September 25, 2019, local boards of health forwarded letters to all

---

[23] *Id.*

[24] Jayne O'Donnell, Sketchy THC vape products. Sneaky teens. How patchwork regulations on e-cigarettes led to health crisis, USA Today (September 23, 2019), at <https://www.usatoday.com/story/news/health/2019/09/23/vaping-illnesses-crisis-teens-black-market-thc-no-regulation/2209009001/> (accessed September 27, 2019).

businesses with permits to sell tobacco products, including ENDS and e-liquids. See Ex. 3. Pursuant to the Commissioner's Order, and the letters from the boards of health, ENDS and e-liquid retailers were required to remove signage and displays related to ENDS and e-liquids products from their stores. In addition, the Defendants required the Plaintiffs to publish a sign issued by the Commonwealth warns against the dangers of ENDS products and e-liquids. Id.

## III.   ARGUMENT

A party seeking a temporary restraining order or preliminary injunction must show (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008); see also Voice of The Arab World v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011); Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop, 839 F. Supp. 68, 70 (D. Mass. 1993) (applying test to TRO). This Court should grant the Plaintiffs injunctive relief, because they satisfy each of these criteria.

### 1.   The Plaintiffs Are Likely To Succeed On The Merits

#### A.   The Defendants' Actions Violate The Dormant Commerce Clause

This Court should grant the Plaintiffs injunctive relief, including a TRO, because the Ban imposes burdens on commerce both inside and outside Massachusetts, precluding all online print depictions of vaping products, and physical display of vaping products. Article 1, § 8, cl. 3 of the United States Constitution expressly authorizes Congress to regulate commerce among the states. However, the Commerce Clause is more than an

affirmative grant of power; it also has a "negative sweep," known as the "dormant" or "negative" Commerce Clause, by which "[a] State is … precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States." Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 278, n. 7 (1977).

Here, the Defendants have violated the dormant Commerce Clause. Among the circumstances in which the dormant Commerce Clause plays a role are those where state action imposes significant burdens on interstate commerce through inconsistent regulation of activities that are inherently national or require a uniform system of regulation. General Motors Corp. v. Tracy, 519 U.S. 278, 298, n. 12 (1997); CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 88 (1987); see also Exxon Corp. v. Governor of Md., 437 U.S. 117, 128 (1978) (Commerce Clause precludes state regulation in a particular field because "a lack of national uniformity would impede the flow of interstate goods.").

For example, in Bibb v. Navajo Freight Lines, Inc., 359 U.S. 520, 529-30 (1959), the Supreme Court held that while states typically have great leeway in establishing laws relating to public health and safety, a state statute regulating the type of mud flap used on trucks traveling through the state imposed too significant a burden on interstate commerce. The Supreme Court also noted the problems that would arise if different states were allowed to impose differing requirements on these issues, concluding that the conflict between two (or more) states' regulations was impermissibly burdensome. Id.; see also Kassel v. Consolidated Freightways Corp. of Delaware, 450 U.S. 662, 671 (1981) (invalidating state statute governing freight truck length).

Here, too, there is a clear need for national uniformity in how tobacco products, including ENDS and e-liquids, are regulated. Indeed, that is the very purpose of the FDA. However, the Ban prevents out-of-state residents from traveling to Massachusetts to purchase ENDS products from the Plaintiffs, even though the sale of products may be legal in their home states. Further, out-of-state businesses no longer may sell ENDS products to Massachusetts retailers, like the Plaintiffs, or to Massachusetts residents through on-line or mail-order sales. As such, the Ban violates the dormant Commerce Clause.

Next, the Ban violates the dormant Commerce Clause by prohibiting the display of ENDS products, precluding all online and print depictions of ENDS products. This is a violation of the dormant Commerce Clause, because compliance renders these images inaccessible to persons in every state. See Consolidated Cigar Corp. v. Reilly, 218 F.3d 30, 55-57 (1st Cir. 2000) (holding cigar advertising regulations violated dormant Commerce Clause by imposing liability on manufacturers for Internet advertising). As such, this Court should enter injunctive relief for the Plaintiffs, including but not limited to a TRO, allowing their shops to reopen.

It is of some moment that the impetus behind the Declaration and the Ban's prohibition on sale or display of ENDS products was twofold: (1) an increase in youth consumption of ENDS products; and, (2) Massachusetts' interest in addressing recent reports of illnesses the specific cause of which is unknown. First, the Plaintiffs do not sell to minors, and are the gatekeepers of protecting the youth from age restricted products. Second, as noted above, most of the reported lung injuries are present in patients that self-reported using ENDS products containing THC. However, the Ban

precludes the sale and display of all ENDS products, regardless of their contents. At bottom, the Plaintiffs sell only certified products that have been tested according to FDA standards in licensed laboratories, the majority of which are comprised of glycol and vegetable glycerin.

## B.    The Ban Violates The First Amendment

The Ban violates the First Amendment of the U.S. Constitution, because the Signage Regulation is not content neutral, and prohibition against all ENDS products retailers, whether inside Massachusetts or not, from displaying ENDS products online in Massachusetts bars "a citizen from another State from disseminating information about an activity that is legal in that State." See Reed v. Town of Gilbert, 135 S.Ct. 2218 (2015); see also Bigelow v. Virginia, 421 U.S. 809, 824-25 (1975). Thus, this Court should grant the Plaintiffs injunctive relief, because the Ban violates this fundamental constitutional principle.

The Defendants have violated the Plaintiffs' First Amendment right to commercial speech, because (1) the display of ENDS products online in states where their sale is permitted is lawful activity; (2) the Commonwealth of Massachusetts has no substantial interest in "the protection of adults from tobacco advertising", which includes ENDS products; (3) protecting adults from ENDS product advertising does not directly advance a permissible government interest, and it runs afoul of the First Amendment; and, (4) the Ban is overbroad and is a categorical ban on any display of such products (even sold solely to adults) within Massachusetts' borders. See Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 566 (1980)[25]; see also Nat'l

_____

[25] Central Hudson Four part test for commercial speech: (1) it at least must concern lawful activity and not be misleading; (2) the asserted governmental interest is substantial; (3) the regulation directly advances the

Assoc. of Tobacco Outlets, Inc. v. City of Worcester, 851 F. Supp. 2d 311, 314-15 (D. Mass. 2012); see also Katt v. Kykhouse, 983 F.2d 690, 695 (6th Cir. 1992); Wash. Mercantile Assoc. v. Williams, 733 F.2d 687, 691 (9th Cir. 1984).

Therefore, this Court should grant the Plaintiff's injunctive relief, because the Ban constitutes an overbroad prohibition on tobacco advertising.

## C.    The Ban Violates The Contracts Clause

This Court should grant the Plaintiffs injunctive relief, including a TRO, because the Ban violates the Contracts Clause insofar as the Plaintiffs contract with out-of-state and in-state wholesalers and landlords. State action unconstitutionally impairs a contract where the court finds that a contractual relationship exists, a change in law impairs that relationship, and the resulting impairment is "substantial." General Motors Corp. v. Romein, 503 U.S. 181, 186 (1992). Whether a contract exists is a federal question for purposes of contract clause analysis. See Irving Trust Co. v. Day, 314 U.S. 556, 561 (1942).

In assessing Contract Claims related to private agreements, courts look to whether: (1) state action substantially impairs a contract; (2) the state acted with a "significant and legitimate public purpose," and (3) the action is "reasonably" tailored to be "appropriate to the public purpose justifying" its adoption. Mercado-Boneta v. Administration del Fondo de Compensacion al Paciete Thorough Ins. Comm'r of Puerto Rico, 125 F.2d 9, 12-13 (1st Cir. 1997) (citations omitted).

Here, the Plaintiffs' existing agreements surely qualify. They maintain contractors with wholesalers who supply, and retailers who operate, out-of-state and in-

---

government interest asserted, and (4) whether or not it is more extensive than is necessary to serve the interest. Central Hudson Gas & Electric Corp., 447 U.S. at 566.

state. Indeed, the Plaintiffs have already stocked their shelves with perishable ENDS products that were supplied by out-of-state wholesalers through existing payment relationships. Moreover, the Plaintiffs have leases with in-state and out-of-state landlords. The agreements have been impaired by the Ban. The Ban has completely and immediately terminated the Plaintiffs' abilities to generate revenue to pay their wholesalers, employees and landlords.

The impairment visited upon the Plaintiffs supply and lease agreement is thus, within the meaning of <u>Romein</u>, "substantial." "Total destruction" of a contract is not necessary to find that state action substantially impairs it – although such is essentially the case here for the Plaintiffs. <u>U.S. Trust Co. v. New Jersey</u>, 431 U.S. 1, 26-27 (1977). Their contracts with the wholesalers who supply ENDS products to Massachusetts have been significantly impaired, because the Plaintiffs can no longer sell such products pursuant to the Ban. And their contracts with their landlords have been significantly impaired, because they cannot pay their rent during the Ban.

The reasonable expectations of the contracting parties play "an important role in determining the sustainability of the contractual impairment." <u>Mercado-Boneta</u>, 125 F.3d at 13. Here, the Governor denied the Plaintiffs notice and opportunity when he issued the Declaration and the Commissioner started enforcing the Ban. The Plaintiffs operate under heavy federal regulation. Thus, they could hardly expect that after successfully navigating the rigorous and exacting federal, state and local regulatory process that ENDS products would suddenly become banned entirely within the Commonwealth of Massachusetts. Rather, the Commonwealth of Massachusetts "impose[d] a completely unexpected liability in potentially disabling amounts … [without] even any provision for

gradual applicability or grace periods." <u>Allied Structural Steel Co. v. Spannaus</u>, 384 U.S. 234, 246, 248 (1978) (decided on other grounds but finding substantial impairment where a state retroactively imposed pension funding charges on companies after closing state offices).

**D.    The Ban Violates The Supremacy Clause**

This Court should grant the Plaintiffs injunctive relief, because the Signage Regulation violates the Supremacy Clause of the U.S. Constitution. Article VI, Clause 2 of the United States Constitution declares "the Laws of the United States … shall be the supreme law of the land." Under the Supremacy Clause, federal law preempts state law when: (1) a federal statute does so "expressly" ("express preemption"); or (2) where the state statute prevents "the accomplishment and execution of the full purposes and objectives" of federal law ("obstacle preemption").

Here, the Signage Regulation is preempted by the TCA and its authority to regulate "labeling" and "modified risk tobacco products" ("MRTP"), because the Signage Regulation regulates in a manner that is "different from or in addition to" federal regulation under the TCA. <u>See</u> 21 U.S.C. § 387p(a)(2)(A).

In short, the Signage Regulation requires the Plaintiffs to display language that contains the statement, "severe lung disease [is] associated with the use of e-cigarettes and vaping products." The Signage Requirement thus requires ENDS product retailers, including the Plaintiffs, to make affirmative statements about the content of certain substances contained in the ENDS products that the sell. Accordingly, the Signage Regulation forces the Plaintiffs to either violate the TCA and Deeming Rule, or violate the Signage Regulation. As such, this Court should grant the Plaintiffs injunctive relief

because the Signage Requirement is preempted by the TCA and the Deeming Rule and should be declared void and unconstitutional.

### E.      The Ban Amounts To A Regulatory Taking

This Court should grant the Plaintiffs' injunctive relief because the Ban amounts to a regulatory taking. The general rule at least is, that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. Here, the Governor's Declaration and the Commissioner's Order are overbroad insofar as the Ban prohibits the sale of an entire class of products, and therefore "goes too far." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 416 (1922).

The Ban goes too far because the ENDS products sold by the Plaintiffs are certified and regulated by the FDA, and the current research shows that the majority of health problems are caused by illegal THC products sold on the black market. And it is admirable that the Governor has a desire to improve the public health. But "[w]e are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." Pennsylvania Coal Co. v. Mahon, 260 U.S. at 416.

Thus, this Court should grant the Plaintiffs' injunctive relief because their property was taken without notice, opportunity or just compensation in violation of the 5th and 14th Amendments.

### F.      The Ban Violates 42 U.S.C. § 1983

For the above-stated reasons, the Defendants have violated 42 U.S.C. § 1983 by depriving the Plaintiffs of their rights under the Supremacy Clause, the Contracts Clause, the Commerce Clause of the United States Constitution, and the Fifth and the Fourteenth

Amendments of the same by issuing the Declaration and enforcing the Ban.  As such, this Court should grant the Plaintiff's injunctive relief, including a TRO.

### 2. Plaintiffs Have Suffered And Will Continue To Suffer Irreparable Harm Absent An Injunction

94.     The Defendants' actions will cause real and irreparable harm for the Plaintiffs, their customers, their vendors, their landlords, their employees and their families.  The Plaintiffs are losing, on average, $4,000-$5,000 per week, per store, as a result of the Ban.  They will likely have to layoff workers and close their shops if the Ban is not lifted.

Without access to ENDS products and e-liquids that are approved and regulated will be forced to return to smoking cigarettes or obtain unregulated ENDS products and e-liquids by other means.

The United States Center for Disease Control ("CDC") has stated that illegal, unregulated products have caused the majority of the 805 suspected cases of illness nationwide.  All of the products sold by the Plaintiffs are regulated by the FDA and certified by laboratories according to FDA standards.

The Plaintiffs have invested substantial time and money into building their business.

The Plaintiffs and their employees rely on the revenue generated by the sales of ENDS products and e-liquids to meet the demands of daily living, including, but not limited to, the purchase of gas, groceries, rent and mortgage payments, car payments, daycare, & c.  After the imposition of the Ban, the Plaintiffs have not been able to benefit from the revenue from the sale of ENDS products and e-liquids.  Thus, the Plaintiffs are unable to direct such revenue towards the payments of rent, groceries, gas and daycare.

The Ban will cause the Plaintiffs financial loss and irreparable harm.

**3.** **The Harm To Plaintiffs Outweighs Any Claimed Harm To Governor Baker And Commissioner Bharel, And The Public Interest Favors An Injunction**

As discussed above, Plaintiffs face irreparable harm to their livelihoods and their First Amendment rights if the Court does not enjoin the Declaration, the Commissioner's Order and the Ban. Governor Baker, and Commissioner Bharel, on the other hand, will not suffer any appreciable harm if they are enjoined to rescind or stay the ban. Indeed, the only harm to the Governor and the Commissioner would be the *de minimus* cost of communicating with the public that ENDS products may continue to be sold and displayed in Massachusetts, pending a determination of the merits of this action. Defendants quickly communicated the ban; they will be able to just as quickly communicate the opposite.

The public, for its part, stands to benefit from an injunction. "The public has not interest in the enforcement of what is very likely an unconstitutional statute." Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp., 715 F.3d 1268, 1290 (11th Cir. 2013). The public does have an interest in lifting the Ban to ensure access to ENDS products, rather than the more dangerous alternative to combustible cigarettes.

Moreover, the public has an interest in having access to ENDS products regulated by the FDA, rather than bootleg e-liquids comprised of THC and vitamin E additives, which have been consumed by patients presenting with illness. As has become evident over the last several months, products sold on the black market pose a significant health risk.[26] By banning lawfully-sold ENDS products, the Commissioner's Order risks creating the very emergency it purportedly seeks to eliminate, because it will likely

---

[26] *See* Sun & McGinley, *Most Vaping-Related Lung Injuries Linked To Marijuana Products*, Washington Post.

exchange a lawful market of regulated ENDS products for a black market where legitimate products are undifferentiated from unregulated and potentially dangerous vaping products.

At bottom, the Ban sweeps too broadly, and presents deleterious and unintended consequences – the public health risks created by the ban outweigh any perceived benefit – in addition to forcing the closure of the Plaintiffs small, family run businesses, and the economic dislocation of their employees and families.

**IV.**     <u>**CONCLUSION**</u>

For the foregoing reasons, the Plaintiffs respectfully request that the Court preliminarily enjoin Governor Baker and Commissioner Bharel from enforcing the Declaration, the Commissioner's Order and the Ban.

Respectfully submitted,

PLAINTIFFS,
MASS DYNAMICS, LCC,
BOSTON VAPOR, LLC,
LINDA AND JEFFREY VICK d/b/a
VICK'S VAPE SHOP,
JIMBUDDY'S INCORPORATED,
and JERALD MOLLMAN d/b/a
J'S VAPOR DEN,
By their attorney,

/s/ Craig E. Rourke

_____
Craig E. Rourke, BBO# 665643
Rourke Law Office, P.C.
325 Central Street
Saugus, MA 01906
(617) 553-9111
crourke@craigrourke.com

Dated:  October __, 2019

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true copy of the above document was filed with the Office of the Civil Clerk for the United States District Court, District of Massachusetts, via electronic means, and will be sent electronically to the Defendants on October __, 2019. Paper copies will be served by hand on the Defendants at the following addresses on October 3, 2019:

**Governor Charles Baker**
Julia E. Kobick, Esq.
Timothy James Casey, Esq.
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2559
julia.kobick@state.ma.us
timothy.casey@state.ma.us

**Commissioner of DPH Monica Bharel, M.D.**
Julia E. Kobick, Esq.
Timothy James Casey, Esq.
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2559
julia.kobick@state.ma.us
timothy.casey@state.ma.us

**Commonwealth of Massachusetts**
Julia E. Kobick, Esq.
Timothy James Casey, Esq.
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2559
julia.kobick@state.ma.us
timothy.casey@state.ma.us

_____/s/ Craig E. Rourke_____
Craig E. Rourke

## LOCAL RULE 7.1(A)(2) CERTIFICATION
## AND CERTIFICATE OF SERVICE

I, Craig E. Rourke, hereby certify that Attorney Cheryl Jacques of my office conferred with counsel from the Office of the Massachusetts Attorney General on or around October 1, 2019 in an effort to resolve or narrow the issues presented in this motion prior to filing.


/s/ Craig E. Rourke

_____

Craig E. Rourke