UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MASS DYNAMICS, LLC, BOSTON VAPOR,
LLC, and LINDA AND JEFFREY VICK d/b/a
VICK'S VAPE SHOP,

Plaintiffs,

v.

CHARLES D. BAKER, in his official capacity as
GOVERNOR OF THE COMMONWEALTH OF
MASSACHUSETTS, MONICA BHAREL, M.D.,
in her official capacity as DEPARTMENT OF
PUBLIC HEALTH COMMISSIONER, and
COMMONWEALTH OF MASSACHUSETTS,

Defendants.

CIVIL ACTION
NO. 19-12035-IT

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUCTION**

MAURA HEALEY
ATTORNEY GENERAL

Timothy J. Casey, BBO # 650913
Julia Kobick, BBO # 680194
Amy Spector, BBO #557611
Assistant Attorneys General
One Ashburton Place
Boston, Massachusetts 02108
617-963-2076
amy.spector@mass.gov

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.     The Emerging Epidemic of Severe Cases of Vaping-Related Lung
          Injury. ................................................................................................. 2

    II.    Governor Baker's Declaration of a Public Health Emergency and
          Commissioner Bharel's Order Temporarily Banning the Sale of
          Vaping Products. ................................................................................ 5

    III.   The Most Recent Data on Deaths and Injuries from Vaping. ................. 8

ARGUMENT ............................................................................................................. 10

    I.     PLAINTIFFS FAIL TO ESTABLISH A LIKELIHOOD OF
          SUCCESS ON THE MERITS OF ANY OF THEIR LEGAL
          CLAIMS. ........................................................................................ 11

          A.     The Emergency Order Comports with the Dormant Commerce
                Clause. ................................................................................... 11

          B.     The Emergency Order Is Not Preempted. ................................. 16

          C.     The Emergency Order Is Wholly Consistent with the First
                Amendment. ........................................................................... 18

          D.     The Emergency Order Does Not Violate the Contracts Clause. ............... 19

          E.     The Emergency Order Does Not Constitute a Taking. ............................. 22

    II.    ANY HARM THAT PLAINTIFFS EXPERIENCE CANNOT
          JUSTIFY THE EXTRAORDINARY RELIEF THEY SEEK. ........................... 24

    III.   THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST
          STRONGLY FAVOR UPHOLDING THE EMERGENCY ORDER. ................ 25

CONCLUSION ........................................................................................................... 26

## INTRODUCTION

Barely three months ago, States throughout the country began to detect an alarming outbreak of severe lung disease associated with the use of e-cigarettes and other vaping products. Within weeks, the incidence of vaping-related lung illnesses skyrocketed. Reflecting the urgent nature of the emerging public health crisis, the federal Centers for Disease Control ("CDC") activated its "Emergency Operations Center" to dedicate greater resources to its investigation of the cause of the illness because, while all of the reported cases have now been linked to vaping, investigators have yet to identify a single brand or ingredient that is common to all of the reported cases of the illness. Numerous medical experts have recognized the severe and potentially long-term effects of vaping, although the full extent of the damage is yet to be known.

In the midst of this public health crisis, Governor Baker, acting pursuant to Mass. Gen. L. c. 17, § 2A, declared a public health emergency in the Commonwealth, and Department of Public Health ("DPH") Commissioner Bharel, with the approval of the Governor and the Public Health Council, issued an Emergency Order banning the sale or display of all vaping products to consumers in Massachusetts. On October 3, 2019, in response to inquiries about the scope of the Order, the Commissioner issued another order "to ensure clarity for businesses subject to" the Emergency Order and to ensure its uniform enforcement. This Implementation Order clarified that the original Emergency Order prohibits the sale of vaping products in Massachusetts retail stores, as well as the sale online, by phone, or by other means for delivery to a consumer in Massachusetts; but the Order does not prohibit a Massachusetts seller from making a sale online, by phone, or by other means of delivery to a consumer located in another State. The Implementation Order also clarified that the Emergency Order "does not apply to the online 'display' of vaping products" and "does not limit the advertisement of vaping products."

The plaintiffs—several retailers of vaping products with stores in Massachusetts and New

Hampshire—filed this action on September 29, 2019, and, on October 2, they filed an amended complaint and a motion seeking a temporary restraining order and preliminary injunction prohibiting enforcement of the Emergency Order. On October 4, following a hearing, this Court denied plaintiffs' request for a TRO, finding that plaintiffs "have not demonstrated a threat of irreparable harm" absent temporary relief. *See Electronic Order* (ECF No. 17).

The plaintiffs' request for preliminary injunctive relief is based on the economic harm that they allege they will suffer if the Emergency Order remains in effect. While defendants recognize that the ban on the sale of vaping products will cause economic displacement for some, the health of Massachusetts residents must take precedence over plaintiffs' economic interests. Until state and federal public health officials are able to pinpoint the specific source of the rapidly growing number of vaping-related illnesses, the continued sale of vaping products in Massachusetts will almost certainly lead to more cases of severe illness, and potentially deaths, among our residents. The Emergency Order is intended to prevent that tragic outcome.

## BACKGROUND

### I.     The Emerging Epidemic of Severe Cases of Vaping-Related Lung Injury.

Throughout the summer of 2019, doctors in hospitals across the country treated an influx of patients who arrived gasping for breath and, in many cases, vomiting and experiencing chest pain, fatigue, and fever.[1] Chest x-rays and CT scans of the patients revealed hazy, opaque blotches in the patients' lungs, but the patients tested negative for infections.[2] Many of the

---

[1] N. Martin, *Why the vaping lung illness crisis is exploding now, according to Boston doctors*, BOSTON GLOBE (Sept. 17, 2019) (Kobick Aff. Ex. A); B. Abbott, *"The Bells Started Going Off." How Doctors Uncovered the Vaping Crisis*, WALL STREET J. (Sept. 23, 2019) (Kobick Aff. Ex. B).

[2] *See id.*; J. Layden et al., *Pulmonary Illness Related to E-Cigarette Use in Illinois and Wisconsin—Preliminary Report*, NEW ENGLAND J. MEDICINE (Sept. 6, 2019), 10.1056/NEJMe1911614 (Kobick Aff. Ex. C).

patients were admitted to intensive care units for respiratory failure, required intubation or mechanical breathing assistance, and suffered from acute respiratory distress syndrome.[3] Some were put into medically induced comas; others have markedly diminished lung capacities and uncertain long-term prognoses.[4]

Doctors in Wisconsin and Illinois, who were treating a cluster of patients, notified CDC officials of this emergent lung illness in August 2019. Officials at the Wisconsin Department of Health Services and the Illinois Department of Public Health initiated a joint public health investigation.[5] While most of the stricken patients had no relevant medical history, doctors realized that they shared one "common denominator": all reported a recent history of vaping.[6]

Vaping products were first introduced to the U.S. market in 2007 as an alternative to traditional cigarettes.[7] Vaporizers are battery-powered devices that use metal coils to heat oils or liquids into vapor to be inhaled into the lungs.[8] Users can vaporize fluids containing nicotine, cannabidiol, and tetrahydrocannabinol ("THC"), the psychoactive ingredient in marijuana.[9] Vaping fluids also contain other potentially toxic compounds and heavy metals.[10]

On September 6, 2019, the *New England Journal of Medicine* published the first article

---

[3] Layden et al., *supra* note 2, at 11.

[4] *See* H. Knowles & L. Sun, *What we know about the mysterious vaping-linked illness and deaths*, WASH. POST (Sept. 27, 2019) (Kobick Aff. Ex. D); J. Bosman, *At School, 'Everyone Vapes,' and Adults Are in Crisis Mode*, N.Y. TIMES (Sept. 20, 2019) (Kobick Aff. Ex. E); Affidavit of Alicia Casey (Kobick Aff. Ex. GG) ¶¶ 2-3.

[5] Layden et al., *supra* note 2, at 5.

[6] Abbott, *supra* note 1; *see* Layden et al., *supra* note 2, at 9.

[7] Layden et al., *supra* note 2, at 2.

[8] Martin, *supra* note 1.

[9] Layden et al., *supra* note 2, at 2.

[10] *See* D. Christiani, *Vaping-Induced Lung Injury*, NEW ENGLAND J. MEDICINE (Sept. 6, 2019), 10.1056/NEJMe1912032 (Kobick Aff. Ex. F) (listing "carbonyls, volatile organic compounds (such as benzene and toluene), particles, trace metal elements according to flavor, and bacterial endotoxins and fungal glucans"); Abbott, *supra* note 1.

that systematically described the presentation of the illness seen in the Wisconsin and Illinois victims.[11]  The "severity of the illness and the recent increase in the incidence of this clinical syndrome," the authors explained, "indicates that these cases represent a new or newly recognized and worrisome cluster of pulmonary disease related to vaping."[12]  Victims of the illness included teenagers and adults, urban and rural residents, men and women.[13]  Of those victims who were interviewed, 44% used both nicotine and THC products in the 90 days before symptom onset, 37% used only THC products, and 17% used only nicotine products.[14]  Aside from the linkage to vaping, the mechanism of illness was unknown and the illness could not be attributed to any single product or substance.[15]  On the same day, a separate editorial in the journal stressed that "there is clearly an epidemic that begs for an urgent response."[16]

The number of afflicted patients kept climbing through September.  By September 18, the CDC, which was conducting its own investigation, had been notified of seven deaths caused by vaping and 530 confirmed or probable cases of vaping-associated lung disease nationwide.[17]  Federal health officials urged the public to stop vaping all substances, including nicotine and THC, while they investigated the cause of the disease.[18]

On September 24, a congressional subcommittee held a hearing on the vaping crisis.  Dr. Anne Schuchat, the Principal Deputy Director of the CDC, testified that "hundreds more" cases

---

[11] Layden et al., *supra* note 2.

[12] *Id.* at 6.

[13] *Id.* at 9.

[14] *Id.* at 12.

[15] *Id.* at 19.

[16] Christiani, *supra* note 10.

[17] Anne Schuchat, M.D., *Written Testimony: House Committee on Oversight & Reform, Subcommittee on Economic and Consumer Policy*, at 1 (Sept. 24, 2019) (Kobick Aff. Ex. G).

[18] *See* N. Martin, *38 patients now have reported to have mysterious vaping-related lung illness in Mass.*, BOSTON GLOBE (Sept. 16. 2019) (Kobick Aff. Ex. H).

of vaping-related illness had been reported to the CDC since September 18.[19]  At a different congressional subcommittee hearing the following day, Dr. Norman Sharpless, Acting Commissioner of the Food and Drug Administration ("FDA"), testified that "[i]nvestigating this [vaping] crisis is FDA's Office of Criminal Investigations' top priority."[20]  Nevertheless, he explained, the "investigation has not identified any specific product or substance or vaping product that is linked to all cases," and "it is not clear" if the cases "have a common cause, or if they involve different diseases with similar presentations."[21]  "In retrospect," Dr. Sharpless acknowledged, "the F.D.A. should have acted sooner."[22]

## II.    Governor Baker's Declaration of a Public Health Emergency and Commissioner Bharel's Order Temporarily Banning the Sale of Vaping Products.

Like States nationwide, Massachusetts is in the midst of the outbreak of vaping-related lung illness.  As of October 10, 2019, DPH had received reports of more than 140 Massachusetts residents with lung injuries potentially linked to vaping.[23]  Nine of the cases were confirmed and ten were probable under the criteria for the vaping-related illness established by the CDC; most others remained under evaluation.[24]  One person in Massachusetts—a woman in her 60s from

---

[19] M. Perrone, *US official expects 'hundreds more' cases of vaping illness*, BOSTON GLOBE (Sept. 24, 2019) (Kobick Aff. Ex. I).

[20] Testimony of Norman E. Sharpless, M.D., *House Committee on Energy and Commerce, Subcommittee on Oversight and Investigations*, at 12 (Sept. 25, 2019) (Kobick Aff. Ex. J).

[21] *Id.* at 11.

[22] S. Kaplan et al., *Juul Replaces Its C.E.O. with a Tobacco Executive*, N.Y. TIMES (Sept. 25, 2019) (Kobick Aff. Ex. K).  Contrary to plaintiffs' characterization that "the FDA already determined that" the products sold by plaintiffs "are approved for marketing and sale in the United States, *see* Pltf. Mem. at 2, the FDA has *not* approved any vaping products, a point underscored by Dr. Sharpless, who stated that "[n]o [e-cigarette] product in the United States is on the market legally," insofar as "the product would need to undergo FDA scientific review and the Agency would have to find that the marketing of the product is appropriate for the protection of the public health."  *See supra* note 20, at 6.

[23] *See* Affidavit of Catherine M. Brown (Kobick Aff. Ex. DD) ¶ 7.

[24] DPH, *Department of Public Health Reports First Death from Vaping-Associated Lung Disease to US Centers for Disease Control and Prevention* (Oct. 7, 2019) (Kobick Aff. Ex. CC); *see also* Lindsey Tucker, *Request for Approval of the Public Health Council for the*

Hampshire County who had vaped nicotine products—has died from the illness.[25]

On September 24, Governor Baker invoked his authority under Mass. Gen. L. c. 17, § 2A to declare that a public health emergency exists that is detrimental to the public health in the Commonwealth of Massachusetts.[26] The Governor's declaration determined that it is "necessary for DPH to take action immediately to address this public health emergency" of "severe lung disease associated with the use of vaping products."[27] Noting the explosion of reported cases nationwide and in Massachusetts, the declaration stressed that "the specific cause of this disease is unknown," but that all cases "have a history of vaping and have indicated a history of using vaping products containing [THC], nicotine, or a combination of THC and nicotine."[28]

Following the Governor's declaration of a public health emergency, and in accordance with Mass. Gen. L. c. 17, § 2A, the Public Health Council met and unanimously voted to approve Commissioner Bharel's Order temporarily banning the sale of vaping products.[29] The Council heard from five physicians on the front lines of the public health crisis: Dr. Alicia Casey, Pediatric Pulmonologist at Boston Children's Hospital; Dr. Benjamin Raby, Chief of Pulmonary Medicine at Boston Children's Hospital; Dr. Sharon Levy, Director of Adolescent Substance Use and Addiction Program at Boston Children's Hospital; Dr. Sucharita Kher, Adult Pulmonologist

---

*Commissioner to Take Action to Address the Public Health Emergency of Vaping* (Sept. 24, 2019) (Kobick Aff. Ex. L).

[25] *See* Affidavit of Catherine M. Brown (Kobick Aff. Ex. DD) ¶¶ 22-23; DPH, *Department of Public Health Reports First Death*, *supra* note 24; N. Martin, *First vaping-related death reported in Mass.*, BOSTON GLOBE (Oct. 7, 2019) (Kobick Aff. Ex. M).

[26] Charles D. Baker, *Governor's Declaration of Emergency* at 2 (Sept. 24, 2019) (Kobick Aff. Ex. N).

[27] *Id.* at 1-2.

[28] *Id.* at 1.

[29] Monica Bharel, MD, MPH, *Order of the Commissioner of Public Health Pursuant to the Governor's September 24, 2019 Declaration of a Public Health Emergency* (Sept. 24, 2019) (Kobick Aff. Ex. O).

and Critical Care Doctor, Director of the Pulmonary Clinic at Tufts Medical Center; and Dr. Maryanne Bombaugh, President of the Massachusetts Medical Society.[30] Dr. Casey explained that, in the acute cases she has seen, "the lungs are diffusely damaged and the pattern of injury . . . is compatible with toxic chemical lung damage."[31] "This acute illness seems quite different from the chronic illnesses that happen after years of smoking," Dr. Kher testified.[32] In line with that testimony, Dr. Raby emphasized that it "is simply untrue" to claim that e-cigarettes are "safer" than traditional cigarettes.[33] Commissioner Bharel also explained that, as part of its implementation of the Order, DPH would immediately increase its capacity to field calls to its smoking cessation hotline, 1-800-QUIT-NOW, and would provide eight weeks of free nicotine replacement treatment to anyone who calls that hotline, a commitment that doubled the amount of nicotine replacement treatment previously provided.[34]

The Commissioner's Emergency Order forbade the "sale or display of all vaping products to consumers in retail establishments, online, and through any other means . . . in the Commonwealth." It covered THC and nicotine products, flavored and unflavored. The Emergency Order, which was effective immediately, will remain in effect for four months, until January 25, 2020, or until the public health emergency is terminated or the Emergency Order is rescinded by the Commissioner. The same day the Emergency Order was issued, DPH notified retailers of the Order,[35] issued guidance to local boards of health on the implementation of the

---

[30] Transcript of Emergency Meeting of the Public Health Council 7:14-22 (Sept. 24, 2019) (Kobick Aff. Ex. P).
[31] *Id.* at 9:5-7.
[32] *Id.* at 20:3-5.
[33] *Id.* at 14:17-24, 15:1-5.
[34] *Id.* at 6:1-13.
[35] *See* Monica Bharel, MD, MPH, *Order of the Commissioner of Public Health Pursuant to the Governor's September 24, 2019 Declaration of a Public Health Emergency (Temporary Ban on Sale or Display of Vaping Products)* (Sept. 24, 2019) (Kobick Aff. Ex. Q).

Order,[36] and sent a letter to health care providers with resources for treating patients who are addicted to nicotine and other substances.[37]

On October 3, 2019, the Commissioner issued another Order to "ensure clarity for businesses subject to the Emergency Order and uniformity in enforcement."[38] This Implementation Order explained that the ban on "display" of vaping products "applies only to the *physical* display of vaping products in retail establishments in Massachusetts."[39] Thus, the term "display" in the Emergency Order "does not apply to the online 'display' of vaping products," nor does it "limit the advertisement of vaping products."[40] The Implementation Order also made clear that the Emergency Order prohibits retailers in Massachusetts from making in-store sales of vaping products; prohibits sellers anywhere from making sales online, by phone, or by other means for delivery of vaping products to a consumer located in Massachusetts; and has no effect on sales online, by phone, or by other means for delivery of vaping products to consumers outside of Massachusetts.[41]

## III.    The Most Recent Data on Deaths and Injuries from Vaping.

In the days after the Governor's Declaration and the Commissioner's Emergency Order, the CDC has continued to release updated numbers of vaping-related fatalities and illnesses across the country.  As of October 10, 2019, 26 people from 21 different States—including

---

[36] *See* Monica Bharel, MD, MPH, Memorandum to Local Boards of Health re: Implementation of DPH order regarding vaping products (Sept. 24, 2019) (Kobick Aff. Ex. R).
[37] *See* Monica Bharel, MD, MPH, Letter to Providers (Sept. 24, 2019) (Kobick Aff. Ex. S).
[38] *See* Monica Bharel, MD, MPH, Order of the Commissioner of Public Health Pursuant to the Governor's September 24, 2019 Declaration of a Public Health Emergency (Oct. 3, 2019) ("Implementation Order") (Kobick Aff. Ex. T).
[39] *Id.* (emphasis added).
[40] *Id.*
[41] *Id.*

Massachusetts—had died from vaping-related lung injuries.[42]  Forty-nine States had reported

1,299 vaping-related cases of lung illness to the CDC.[43]  Consistent with the aforementioned data

from Wisconsin and Illinois, 58% of the afflicted patients had vaped nicotine products, with 13%

reporting exclusively vaping nicotine products; 76% had vaped THC products, with 32%

reporting exclusively vaping THC products.[44]  The CDC emphasized that "[t]he specific

chemical exposure(s) causing lung injuries associated with e-cigarette product use, or vaping,

remains unknown at this time,"[45] and it continued to recommend that people refrain from using

any vaping products.[46]  In light of this data, the Army, Air Force, Navy, and Coast Guard banned

the sale of all e-cigarettes from their stores on military bases on October 1.[47]

Last week, doctors at the Mayo Clinic published research in the *New England Journal of Medicine* concluding that the lungs of people with acute vaping-related lung illness most closely

resembled the lungs of people with "chemical burns."[48]  As the reporting on this study reiterated,

> Medical investigators have been unable to identify exactly what is causing the
> lung damage, or even how many harmful substances are involved.  They do not
> know whether the source is the liquids being vaped, or a toxin released from the
> materials used to make vaping devices.  It is also unclear whether some devices
> used in vaping may be defective.[49]

According to an author of the study, the lungs of people with vaping-related illness exhibit "the

---

[42] CDC, Outbreak of Lung Injury Associated with E-Cigarette Use, or Vaping (Oct. 3, 2019) (hereinafter "CDC Outbreak Oct. 10") (Kobick Aff. Ex. U).

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *See* J. Maloney, *U.S. Army Is Treating Two Soldiers for Vaping-Related Lung Illness*, WALL STREET JOURNAL (Oct. 9, 2019) (Kobick Aff. Ex. EE).

[48] D. Grady, *Lung Damage from Vaping Resembles Chemical Burns, Report Says*, N.Y. TIMES (Oct. 2, 2019) (Kobick Aff. Ex. X); Y. Butt et al., *Pathology of Vaping-Associated Lung Injury*, NEW ENGLAND J. MEDICINE (Oct. 2, 2019) (Kobick Aff. Ex. Y).

[49] Grady, *supra* note 48.

kind of change you would expect to see in an unfortunate worker in an industrial accident where

a big barrel of toxic chemicals spills, and that person is exposed to toxic fumes and there is a

chemical burn in the airways."[50]  "The injuries also look like those seen in people exposed to

poisons like mustard gas, a chemical weapon used in World War I," the doctor added.[51]

## ARGUMENT

A preliminary injunction is "an extraordinary and drastic remedy," *Mazurek v.*

*Armstrong*, 520 U.S. 968, 972 (1997), "never awarded as of right."  *Winter v. Natural Res. Def.*

*Council, Inc.*, 555 U.S. 7, 24 (2008).  "To obtain a preliminary injunction, the plaintiffs bear the

burden of demonstrating (1) a substantial likelihood of success on the merits, (2) a significant

risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4)

a fit (or lack of friction) between the injunction and the public interest."  *Nieves-Marquez v.*

*Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).  The last two factors "merge when the

Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The first

factor—likelihood of success on the merits—is the "'sine qua non' of a preliminary injunction."

*Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 173 (1st Cir. 2015)

(citations omitted).  "[T]he movant, by a clear showing, carries the burden of persuasion."

*Mazurek*, 520 U.S. at 972.

Here, the Court should deny the plaintiffs' motion for a preliminary injunction.  The

Court already found that plaintiffs failed to establish irreparable harm pending briefing on a

preliminary injunction, *see* ECF No. 17, and the plaintiffs' claim of harm fares no better at this

injunction stage.  In particular, the plaintiffs fail to establish that any economic harm they may

suffer will be irreparable, given the fact that vaping products have a shelf life of one to two

---

[50] *See id.*
[51] *Id.*

years—well beyond the duration of the temporary, four-month ban.

Moreover, the plaintiffs fail to establish that they are likely to succeed on any of their claims. The Emergency Order does not place an undue burden on interstate commerce and does not violate plaintiffs' First Amendment rights. Contrary to plaintiffs' claim that the Order is preempted by the Family Smoking Prevention and Tobacco Control Act, federal law expressly recognizes the States' authority to regulate sales of the products at issue. In addition, the Order does not impermissibly interfere with plaintiffs' rights under the Contracts Clause, nor does it constitute a taking under the Fifth and Fourteenth Amendments.

Finally, the balance of equities favors upholding the temporary ban, as the financial harm that plaintiffs allegedly will suffer is outweighed by the overwhelming public interest in protecting Massachusetts residents from a rapidly escalating, life-threatening public health emergency. For the same reason, the public interest strongly weighs in favor of keeping the ban in place while state and federal investigators work to pinpoint the source of the illness.

## I. PLAINTIFFS FAIL TO ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF ANY OF THEIR LEGAL CLAIMS.

### A. The Emergency Order Comports with the Dormant Commerce Clause.

The Commerce Clause, which authorizes Congress "[t]o regulate Commerce . . . among the several States," U.S. Const., Art. I, § 8, cl. 3, also "limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce." *Maine v. Taylor*, 477 U.S. 131, 151 (1986). Nevertheless, the "restriction imposed on states by the dormant Commerce Clause is not absolute." *Pharmaceutical Research & Manufacturers of Am. v. Concannon*, 249 F.3d 66, 79 (1st Cir. 2001), *aff'd*, 538 U.S. 644 (2003). Rather, "the States retain authority under their general police powers to regulate matters of legitimate local concern, even though interstate commerce may be affected." *Maine*, 477 U.S. at 138.

The plaintiffs do not contend that the Emergency Order discriminates against interstate commerce on its face, and properly so. Instead, they argue that the Emergency Order places an undue burden on interstate commerce under the test articulated in *Pike v. Bruce Church, Inc*., which applies when a challenged government action "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental." 397 U.S. 137, 142 (1970); *see* Pltf. Mem. at 10. Under that test, the government action must "be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. "State laws frequently survive this *Pike* scrutiny," the Supreme Court has emphasized. *Dept. of Revenue of Ky. v. Davis*, 553 U.S. 328, 339 (2008). Moreover, "[t]he crucial inquiry" in any undue-burden case "must be directed to determining whether [the challenged law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978).

The Emergency Order plainly is not a "protectionist measure" designed to bolster in-state industry and burden out-of-state competitors. The Governor and Commissioner, public officials charged with safeguarding the wellbeing of Massachusetts residents, have taken an emergency action to target an imminent threat to the health and safety of Massachusetts residents. They determined that, in light of the severe lung illness afflicting users of vaping products in Massachusetts and nationwide, a temporary ban on vaping products is necessary to prevent deaths and injuries within Massachusetts. *See supra*, at 5-8. Accordingly, the Commissioner prohibited the sale of vaping products for four months or until the public health emergency is terminated or the Order is rescinded. The Order, which applies even-handedly to in-state and out-of-state sellers alike, is a legitimate policy decision directed to an urgent matter of local

concern. Indeed, because it involves public health and safety, it goes to the core of the Commonwealth's police powers. *See United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 344 (2007) (courts "should be particularly hesitant to interfere . . . under the guise of the Commerce Clause" where a local government engages in a traditional government function); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (noting "the historic primacy of state regulations of matters of health and safety").

Nor does the Emergency Order unduly burden interstate commerce or disrupt national uniformity. This Court has emphasized that "[i]t does not contravene the dormant commerce clause for a state merely to regulate the distribution within its borders of a product that travels in interstate commerce." *Zogenix v. Baker*, No. 14-11689-RWZ, 2015 WL 1206354, at *7 (D. Mass. March 17, 2015) (rejecting a dormant Commerce Clause challenge to regulations promulgated to address public health crisis in opioid abuse). Thus, in *National Kerosene Heater Association v. Commonwealth*, this Court rejected a dormant Commerce Clause challenge to a ban on the sale of certain kerosene space heaters within Massachusetts. *See* 653 F. Supp. 1079, 1092-96 (D. Mass. 1987). As the Court explained, a "total ban" of a product "certainly" disrupts national uniformity "to a lesser extent than a regulation which imposes certain manufacturing standards which conflict with manufacturing standards imposed by other states." *Id.* at 1093.[52]

---

[52] The Supreme Court likewise has upheld bans on products against dormant Commerce Clause challenges, and it has done so in cases involving government objectives less urgent than stemming a life-threatening public health crisis. In *Minnesota v. Clover Leaf Creamery Co.*, for example, Minnesota banned the sale of milk sold in plastic, nonreturnable containers in order to promote conservation. 449 U.S. 456, 458-59 (1981). Even if the ban would burden the out-of-state plastics industry more than the non-plastic bottling industry in Minnesota, the Court reasoned, the burden was "not 'clearly excessive' in light of the substantial state interest in promoting conservation of energy and other natural resources." *Id.* at 473. And in *Exxon Corp. v. Governor of Maryland*, the Court upheld a Maryland law that, in response to a petroleum shortage, banned retail gasoline stations operated by producers and refiners of petroleum products. 437 U.S. 117, 125-30 (1978).

Like the ban on space heaters, the temporary ban on vaping products within Massachusetts does not disrupt the flow of commerce nationwide. For that reason, the cases involving interstate transporters cited by the plaintiffs are inapposite. *See* Pltf. Mem. at 11. Subjecting transportation companies to a patchwork of state laws on truck mud flaps, *see Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529-30 (1959), or freight truck length, *see Kassel v. Consolidated Freightways Corp. of Delaware*, 450 U.S. 662, 671 (1981), would force those companies to choose between abiding by conflicting laws or avoid traversing certain States altogether, which would necessarily impede the flow of commerce between States. But banning products within a State—and here, products that have *not* been approved for sale by the FDA, *see supra*, at 5 n. 22—does not have the same disruptive effect on the national economy. *See National Kerosene Heater Ass'n*, 653 F. Supp. at 1092-96.

The plaintiffs next argue that the Emergency Order prohibits online and print depictions of vaping products across state lines. *See* Pltf. Mem. 12. But the Implementation Order makes clear that the Emergency Order only prohibits the *physical* display of vaping products in Massachusetts stores, and that it "does not limit the advertisement of vaping products." *See* Implementation Order. The plaintiffs also object that the Emergency Order prevents out-of-state residents from purchasing vaping products in Massachusetts stores and prevents out-of-state businesses from selling vaping products to Massachusetts retailers or to Massachusetts residents through online or mail-order transactions. *See* Pltf. Mem. at 12. But by its plain terms, the Emergency Order bans sales only to "consumers"; it has no effect on sales between retailers. And the plaintiffs have introduced no evidence on the frequency with which out-of-state residents travel to Massachusetts to purchase vaping products, or with which Massachusetts residents order vaping products online from out-of-state retailers. And even if these transactions

did occur, the modest burden imposed by temporarily barring these transactions is not "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. The plaintiffs' theory—that a ban on a product within Massachusetts unduly burdens interstate commerce merely because it has incidental effects on online transactions—would threaten the constitutionality of many of the Commonwealth's essential public safety measures. *See, e.g.*, Mass. Gen. L. c. 140, § 131M (banning the sale of assault weapons and large-capacity magazines in Massachusetts); *see also SPGGC, LLC v. Blumenthal*, 505 F.3d 183, 195 (2d Cir. 2007) (holding that the plaintiff did "not state a valid claim for relief under the dormant Commerce Clause simply because it conduct[ed] business over the Internet," and noting that there was "no risk that the [challenged law] will control sales . . . to anyone other than [in-state] consumers, whether such sales occur in person or online").

The plaintiffs contest the strength of the Commonwealth's interests advanced by the Emergency Order, but their efforts to undercut the rationale for the Order are inaccurate and misleading. The Emergency Order applies to both nicotine and THC products because, as the CDC has explained, "[t]he specific chemical exposure(s) causing this outbreak is unknown" and consumers should therefore refrain from using *any* vaping products.[53] The plaintiffs argue that "most of the reported lung injuries are present in patients that self-reported using ENDS products containing THC," Pltf. Mem. at 12, but since early September, the data has shown that the majority of victims reported using nicotine *and* THC products; 13-17% of victims reported using *only* nicotine products; and 32-37% of victims reported using *only* THC products. *See supra*, at 4, 9. The Emergency Order applies to nicotine and THC products because a significant percentage of victims used only nicotine products, and a significant percentage of victims used

---

[53] CDC Outbreak Oct. 10, *supra* note 42.

only THC products. *See id.* The Order is not overbroad, as the plaintiffs contend; rather, reflecting the best available evidence, it is tailored to scope of the still-unfolding public health crisis. *Cf. Zogenix*, 2015 WL 1206354, at *8 ("[A]ny burden that the [agency] regulations might have on interstate commerce cannot 'clearly exceed' the regulations' putative benefits of promoting public health and safety by combating opioid abuse.")

The Commonwealth's temporary ban on vaping products does not impose an undue burden on interstate commerce. If there is any burden at all, it is not "clearly excessive" when balanced against the state's vital objective of preventing deaths and injuries from an emergent, but still poorly understood, illness caused by vaping products. The plaintiffs have failed to demonstrate any likelihood of success on the merits on their dormant Commerce Clause claim.

### B. The Emergency Order Is Not Preempted.

The plaintiffs' claim that federal law preempts the Emergency Order's purported "Signage Regulation" is equally meritless.

According to the plaintiffs, the Emergency Order "requires" retailers of vaping products "to display language" containing the statement that "severe lung disease [is] associated with the use of e-cigarettes and vaping products," and for that reason is "pre-empted" by the Tobacco Control Act's provisions governing labeling of tobacco products and "modified risk tobacco products," 21 U.S.C. § 387p(a)(2)(A). Pltf. Mem. at 16-17. But as the Court correctly discerned at the TRO hearing on October 4, the Emergency Order requires no such thing. *See* Emergency Order and Implementation Order (Kobick Aff. Exs. O and T). The Emergency Order and Implementation Order do *not* require that retailers display a sign containing the language quoted above—or indeed *any* sign relating to the prohibition on sales of vaping products. *Id.*

Rather, in notifying local health boards of the Emergency Order, DPH provided guidance in the form of recommendations intended to "assist Boards of Health" in enforcement of the

Emergency Order.  *See* Affidavit of Ronald O'Connor (Kobick Aff. Ex. FF) ¶¶ 3-4 & Ex. A.

Such guidance included a sample sign that retailers *could* use—if they chose to do so—as a

means to inform customers of the ban on sale of vaping products.  *See id.* ¶¶ 4-5.   A sample

sign, which was included in the packet of guidance materials accompanying a DPH

memorandum to local boards, states:

> On September 24, 2019, Governor Baker declared a public health emergency due
> to severe lung disease associated with the use of e-cigarettes and vaping products
> and the epidemic of e-cigarette use among youth.  The Commissioner of Public
> Health has temporarily prohibited the sale and display of all vaping products and
> e-cigarettes until further notice.

*Id*.; *see also* Am. Compl. Ex. 3.  The Emergency Order itself, and DPH's guidance materials, do

not contain any requirement that retailers use the sample sign or its language, and plaintiffs do

not point to any directive from DPH (or any local health board) purporting to *require* that

retailers use the sample sign or otherwise display the language suggested in it.  Moreover, DPH's

website itself reflects that use of the sample sign is entirely voluntary; the website page

describing the current public health crisis, in the section entitled "Information for Retailers,"

includes the following language:  "The attached signage *can* be posted to notify your customers,"

and includes a link to two different sizes of the sign.  *See* DPH, Vaping Public Health

Emergency, https://www.mass.gov/guides/vaping-public-health-emergency, last visited Oct. 10,

2019 (emphasis added); *see also* O'Connor Aff. ¶ 6.

Simply put, plaintiffs provide no reasoned argument to support their assertion that DPH's

provision of the sample sign, which retailers are free to ignore, could somehow be understood as

"regulat[ing] in a manner that is 'different from or in addition to'" the Tobacco Control Act's

provisions governing labeling of product packages.  Beyond its entirely voluntary nature, the

sample sign provided by DPH to local health boards has nothing to do with labeling of *product packages* at all.

Moreover, plaintiffs' preemption claim fails for another fundamental reason: the Act expressly reserves States' power to regulate "sales" of vaping products, 21 U.S.C. § 387p(a)(1), and further preserves State authority to adopt "requirements relating to the sale, distribution, possession, . . . access to, the advertising and promotion of, or use of, tobacco products by individuals of any age." 21 U.S.C. § 387p(a)(2)(B); *see generally Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence, R.I.*, 731 F.3d 71, 81-83 (1st Cir. 2013) (rejecting preemption claim and upholding ordinance banning sale of flavored tobacco products); *Order* in *Mister E-Liquid LLC v. Governor Gretchen Whitmer*, Civil Action No. 19-00786 (W.D. Mich. September 30, 2019) (ECF No. 9) (Kobick Aff. Ex. AA), at 4 ("How can [Michigan's ban on flavored vaping products] be preempted if Congress expressly preserved the State's ability to make more stringent regulatory decisions, including a ban, on the products?"). For all of the above reasons, the plaintiffs stand no chance of prevailing on their preemption claim.

### C. The Emergency Order Is Wholly Consistent with the First Amendment.

The plaintiffs' First Amendment challenge to the Emergency Order depends on their contention that the Order would prohibit advertising, a form of commercial speech protected by the First Amendment. Pltf. Mem. at 13-14. More specifically, they contend that advertising of vaping products would constitute protected speech under the factors outlined in *Central Hudson Gas & Electric Corp. v. Public Service Comm'n*, 447 U.S. 557, 566 (1980), the Supreme Court's leading case governing commercial speech. Pltf. Mem. at 13-14. But the Emergency Order does not apply to advertising at all. As the Implementation Order explains, the Emergency Order "does not apply to the online 'display' of vaping products": and "does not . . . limit the advertisement of vaping products." *See* Implementation Order. The Emergency Order's

reference to "display of all vaping products to consumers" thus prohibits *only* "the physical display of vaping products in retail establishments in Massachusetts," and simply "requires Massachusetts retailers to remove from their shelves usable product that falls within the Emergency Order's definition of 'vaping products.'" *Id.*

The plaintiffs also contend, in a single sentence, that the "Signage Regulation is not content neutral." Pltf. Mem. at 13. But, as explained, there is no "Signage Regulation" at all; DPH has never required the posting of a sign by retailers, but instead only created an optional sign that retailers may post should they so choose. *See supra*, at 16-17. The plaintiffs therefore have no chance of success on their First Amendment claim because it is premised exclusively on incorrect interpretations of the Emergency Order.

### D. The Emergency Order Does Not Violate the Contracts Clause.

The plaintiffs' claim under the Contracts Clause similarly lacks merit. Any alleged impairment of plaintiffs' contracts is insubstantial and justified by the defendants' legitimate objective of preventing further vaping-related cases of lung illness or death.

The Contracts Clause provides that "[n]o State shall . . . pass any . . . Law . . . impairing the Obligation of Contracts." U.S. Const. art. 1, § 10, cl. 1. But the Contracts Clause "does not operate to obliterate the police power of the States" because a State's "exercise of [its] sovereign right . . . to protect the lives, health, morals, comfort and general welfare of the people . . . is paramount to any rights under contracts between individuals." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 241 (1978). Accordingly, "the Contracts Clause 'must be accommodated to the inherent police power of the State to safeguard the vital interests of its people.'" *Alliance of Automobile Mfrs. v. Gwadosky*, 430 F.3d 30, 42 (1st Cir. 2005) (quoting *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 410 (1983)).

Analysis of a Contracts Clause claim proceeds in two steps.  First, a court must ask "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship."  *Allied Structural Steel*, 438 U.S. at 244.  That inquiry "elicits an affirmative answer only if 'a contractual relationship exists, that relationship is impaired by a change in the law, and the resultant impairment is substantial.'"  *Gwadosky*, 430 F.3d at 42 (quoting *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178, 190 (1st Cir. 1999)).  Impairment is not substantial when the contracting parties operate in a regulated industry and should therefore expect that regulatory changes will affect their contracts.  *Energy Reserves*, 459 U.S. at 413; *Gwadosky*, 430 F.3d at 42.  Second, even if a state law does substantially impair a contact, the court must determine whether the impairment is "appropriate for, and necessary to, the accomplishment of a legitimate public purpose."  *Town of Houlton*, 175 F.3d at 191.

The plaintiffs' claim fails at the first step of the analysis.  While plaintiffs allege that they have "contracts with wholesalers who supply ENDS [electronic nicotine delivery systems] products and e-liquids to retailers in the Commonwealth" and leases with landlords that the Emergency Order allegedly has impaired, *see* Am. Compl. ¶¶ 128-29, the plaintiffs cannot, as a matter of law, allege any substantial impairment.  As an initial matter, the Emergency Order only prohibits sales to "consumers," not wholesalers.  *See* Emergency Order.  And in any event, in assessing substantiality, "it is especially important whether or not the parties have been operating in a regulated industry."  *Gwadosky*, 430 F.3d at 42.  Contracting parties operating in a regulated industry can anticipate that additions to the regulatory regime will impact their contracts, so the law requires courts to "look long and hard at the reasonable expectations of the parties."  *Town of Houlton*, 175 F.3d at 190.

The plaintiffs operate in an industry in which they could reasonably expect that their product will be subject to regulation by public health officials.  While the FDA has not approved any vaping products, *see* Sharpless Testimony, *supra* note 20, at 6, it has asserted regulatory authority to review the safety of such products, by virtue of its issuance of a "deeming rule" in 2016, which determined that e-cigarettes and other related vaping products constitute "tobacco products" subject to its authority.  *See* 81 Fed. Reg. 28974 (May 10, 2016).  As a consequence of that determination, manufacturers of vaping products are already subject to certain tobacco product requirements and will be required to submit to FDA's pre-market approval process by May 2020.  *See* Sharpless Testimony, *supra* note 20, at 4-6.  Because plaintiffs thus operate in an industry in which they will—in the very near future—be subject to FDA regulation, the law assumes that they foresee that "additions to th[e] regulatory regime" may disrupt their contractual obligations.  *Id.*  Under those circumstances, any impairment of contract is, as a matter of law, insubstantial.  *See, e.g.*, *Energy Reserves*, 459 U.S. at 413-15; *Gwadosky*, 430 F.3d at 42; *Town of Houlton*, 175 F.3d at 190; *see also* Maloney, *supra* note 47 (stating that "[m]ajor retailers including Walmart Inc., Walgreens Boots Alliance Inc. and Kroger Co., have stopped selling all e-cigarettes, citing the lung illness and regulatory uncertainty").

Moreover, even if the Court were to assume that the Emergency Order results in substantial impairment of the plaintiffs' contracts, the plaintiffs' claim still fails at the second step of the analysis.  The Emergency Order unquestionably advances a legitimate public purpose, as it is beyond dispute that "[p]rotecting the health and safety of the community [is] an important governmental objective that falls squarely within the [government's] police powers." *Easthampton Savings Bank v. City of Springfield*, 874 F. Supp. 2d 25, 32 (D. Mass. 2012); *see also Town of Houlton*, 175 F.3d at 191 ("Health and safety are two mainstays of the police

power.").  When, as here, "the contracts at issue are private and no appreciable danger exists that the governmental entity is using its regulatory power to profiteer or otherwise serve its own pecuniary interests," *Town of Houlton*, 175 F.3d at 191, "courts properly defer to [the government's] judgment as to the necessity and reasonableness of a particular measure." *Energy Reserves*, 459 U.S. at 412–13.  The Court accordingly owes deference to the Commissioner's judgment that the Emergency Order is reasonable and necessary to protect public health and safety.  *See, e.g.*, *Zogenix*, 2015 WL 1206354, at *6 (rejecting Contracts Clause challenge to regulations promulgated to combat opioid overdoses).  For this reason as well, the plaintiffs have no chance of success on the merits of their Contracts Clause claim.

> ### E.     The Emergency Order Does Not Constitute a Taking.

The plaintiffs fare no better in alleging that the Emergency Order constitutes a taking of their property.  The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V; *Knick v. Township of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167 (2019).  The Takings Clause applies to the States by virtue of the Fourteenth Amendment.  *Chicago, B & Q. R. Co. v. City of Chicago*, 166 U.S. 226, 241 (1897).  Plaintiffs contend that the Emergency Order effects a taking of their property because it "has gone too far."  Am. Compl. ¶ 137.  But under settled case law, a State's prohibition on the possession or sale of dangerous products does not constitute a taking at all.

The Supreme Court has long held that when a State, in the exercise of its police powers, regulates property to protect public health and safety, its action does not constitute a "taking." *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1022 (1992) (citing "a long line of this Court's cases sustaining against Due Process and Takings Clause challenges the State's use of its 'police powers' to enjoin a property owner from activities akin to public nuisances"); *id.* at 1022-23 (explaining theoretical underpinnings for Court's past decisions reflecting that

"government may, consistent with the Takings Clause, affect property values by regulation without incurring an obligation to compensate—a reality we nowadays acknowledge explicitly with respect to the full scope of the State's police power").  As the First Circuit has aptly noted, "Government hardly could go on if it could not execute programs that adversely affect property values without paying for every such change, . . .  and the [Supreme] Court has held, in a wide variety of settings, that governmental actions destroying recognized economic interests did not constitute takings."  *Ortega Cabrera v. Municipality of Bayamon*, 562 F.2d 91, 100 (1st Cir. 1977).[54]

   An early, oft-cited example of this principle, discussed in *Lucas*, *see id.* at 1022, is *Mugler v. Kansas*, where the Court held that a Kansas law prohibiting the sale and manufacture of alcohol within the State did not constitute a taking:  "A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit."  123 U.S. 623, 668-69 (1887).  The Court in *Mugler* found it irrelevant that, at the time the affected brewery owners had purchased their breweries, Kansas law had not prohibited manufacture of alcohol.  *Id.* at 669.  As the Court emphasized, States are empowered to address emergent circumstances as they arise:  "[T]he supervision of the public health . . . is a governmental power, continuing in its nature, and to be dealt with as the special exigencies of the moment may require," and "for this purpose, the largest legislative discretion is

---

[54] *See also, e.g.*, *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 124 n.32 (3d Cir. 2018) ("A compensable taking does not occur when the state prohibits the use of property as an exercise of its police powers rather than for public use."); *McCutchen v. United States*, 2019 WL 4619754 (Ct. Cl. September 23, 2019) ("[I]t is well established that there is no taking for 'public use' where the government acts pursuant to its police power, i.e., where it criminalizes or otherwise outlaws the use or possession of property that presents a danger to the public health and safety.").

allowed." *Id.* at 669 (internal citation and quotation marks omitted); *see also*, *e.g.*, *Miller v. Schoene*, 276 U.S. 272 (1928) (order to destroy diseased cedar trees to prevent infection of nearby orchards did not effect a taking).

Under these precedents, the Commissioner's Order temporarily prohibiting the sale of a dangerous product does not constitute a taking.

## II. ANY HARM THAT PLAINTIFFS EXPERIENCE CANNOT JUSTIFY THE EXTRAORDINARY RELIEF THEY SEEK.

When, as here, "the moving party cannot demonstrate that [they are] likely to succeed [on the merits], the remaining factors become matters of idle curiosity." *Arborjet*, 794 F.3d at 173; *see also Weaver v. Henderson*, 984 F.2d 11, 14 n.5 (1st Cir. 1993) ("[E]ven 'excruciatingly obvious' injury is irrelevant when a plaintiff has not demonstrated likely success on the merits." (citation omitted)). Here, the plaintiffs have failed to establish that they are likely to prevail on any of their claims.

In any event, the harm that the plaintiffs allege is diminished by the temporary nature of the Emergency Order. The plaintiffs assert that the Emergency Order will cause significant financial harm to the vaping industry in Massachusetts and to out-of-State sellers, *see* Pltf. Mem. at 18, allegedly resulting in the closure of their stores and causing attendant layoffs of their employees. While defendants acknowledge the economic effects of the Order on plaintiffs' businesses, plaintiffs' asserted harm is diminished by the fact that the Order does not require them to discard their stock of vaping products, and, given the one-to-two-year shelf-life of such products,[55] the inability to sell these products for four months is not irreparable harm. *See Am. Grain Products Processing Inst. v. Dep't of Public Health*, 392 Mass. 309, 328 (1984) (vacating

---

[55] *See* S. Papamichael, *E-Liquid Guide: Ingredients, Shelf Life, Nic Strengths and More*, Vaping360.com (Aug. 2, 2018) (Kobick Aff. Ex. Z).

preliminary injunction against enforcement of emergency regulation banning sale of food products containing certain levels of ethylene dibromide, and holding that plaintiffs had failed to establish irreparable harm where, among other facts, none of the products were perishable "and nearly all of them have a shelf life of one to four years"). Moreover, the Emergency Order does not prohibit Massachusetts retailers from selling vaping products for delivery to consumers outside of Massachusetts and does not prohibit sales between retailers and wholesalers, in state or out of state. *See* Emergency Order and Implementation Order.

## III. THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST STRONGLY FAVOR UPHOLDING THE EMERGENCY ORDER.

Issuance of an injunction against enforcement of the Emergency Order would put the health and safety of Massachusetts residents in immediate jeopardy. While plaintiffs have alleged significant disruption to their business interests, the strong public interest in preventing additional vaping-related lung illnesses among Massachusetts residents, with attendant hospitalizations and potential deaths, is paramount. Particularly given the "severity of the illness," *see* Layden, *supra* note 2, at 6, and the rapidly escalating nature of the epidemic, the balance of equities and public interest weigh strongly in favor of keeping the Emergency Order in place while medical and public health professionals work to determine the cause of the illness. Indeed, in a related lawsuit challenging the Emergency Order, this Court rejected a motion for a temporary restraining order in part because granting the emergency relief "would conflict with the public interest." *See* Electronic Order in *Vapor Technology Ass'n v. Baker*, No. 1:19-cv-12048-IT (D. Mass. Oct. 4, 2019) (ECF No. 25).[56]

---

[56] The plaintiffs in the *Vapor Technology Ass'n* case have likewise sued Governor Baker and Commissioner Bharel in Massachusetts Superior Court. *See Vapor Technology Ass'n v. Baker*, No. 1984CV03102-B (Mass. Super.). The Superior Court held a hearing on plaintiffs' motion for a preliminary injunction on October 9, 2019. It then heard testimony from one of the

In emergency circumstances such as these, economic harm must yield to protection of public health.  As the Department of Public Health aptly noted during another public health emergency—the 1972 "red tide" in Massachusetts waters that was linked to 26 cases of paralytic shellfish poisoning among residents—the disruption to the shellfish industry resulting from a temporary ban on shellfish products was an "unavoidable cost."  "In an unanticipated and acute public health emergency . . . it is impossible to protect the industry and the consumer simultaneously.  The first concern has to be the life and health of the consumer."[57]

## CONCLUSION

For all the reasons set forth above, the Court should deny plaintiffs' motion for a temporary restraining order and preliminary injunction.

---

plaintiffs' affiants, Michael Siegel, M.D., on October 10.  The hearing has been continued to October 18, 2019, for further testimony.

[57] W. Bicknell & D. Walsh, Massachusetts Dept. of Public Health, *The First 'Red Tide' in Recorded Massachusetts History: Managing an Acute and Unexpected Public Health Emergency*, in PROCEEDINGS OF THE FIRST INTERNATIONAL CONFERENCE ON TOXIC DINOFLAGELLATE BLOOMS 456 (V. LoCicero, ed. 1974) (Kobick Aff. Ex. BB).  As a law review article summarizing this exercise of the Governor's and DPH's powers under Mass. Gen. L. c. 17, § 2A explained, "in September 1972, after the discovery of about 100 dead seabirds in the Merrimack River estuary, a toxic algal bloom south of Plum Island was identified. The [DPH] concluded that the particular toxic algae posed a very real threat of paralytic shellfish poisoning.  Then-Governor Dukakis declared a public health emergency which gave the Commissioner of Public Health sweeping powers for any action related to the defined emergency.  The Commissioner of Public Health obtained this within two hours of request, and instituted a total embargo on the harvesting, sale, import and export of all fresh and frozen shellfish at wholesale and retail levels.  The major lesson of this incident for the present discussion is that a declaration of a public health emergency by the governor gave the DPH sweeping and fluidly defined powers to deal with an unfolding and unpredictable emergency." Warren Kaplan, *Massachusetts Disease Control Law in the 21st Century: Running in Place?*, 87 MASS. L. REV. 84, 89 (2002).

Respectfully submitted,

GOVERNOR CHARLES D. BAKER,
COMMISSIONER MONICA BHAREL, and
COMMONWEALTH OF MASSACHUSETTS,

By their attorneys,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Amy Spector
Timothy J. Casey, BBO # 650913
Julia Kobick, BBO # 680194
Amy Spector, BBO #557611
Assistant Attorneys General
One Ashburton Place
Boston, Massachusetts 02108
617-963-2076
Dated: October 11, 2019          amy.spector@mass.gov

## CERTIFICATE OF SERVICE

I hereby certify that the above memorandum of law, which I filed electronically through the Court's electronic case filing system on October 11, 2019, will be sent electronically to all parties registered on the Court's electronic filing system.

/s/ Amy Spector
Amy Spector, BBO #557611